# In the United States Court of Appeals for the Fifth Circuit

**No. 26-40057**

POWER CONTRACTING, LLC,
PLAINTIFF-APPELLANT,
v.

DAVID THURMAN,
DEFENDANT-APPELLEE

On Appeal from the U.S. District Court
for the Southern District of Texas
No. 3:24-cv-00078 (Brown, J.)

## APPELLANT'S OPENING BRIEF


Anna G. Rotman, P.C.
Allyson C. Arias
KIRKLAND & ELLIS LLP
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3600

Aaron L. Nielson
David Hutchison
KIRKLAND & ELLIS LLP
401 W. 4th Street
Austin, TX 78701
Telephone: (512) 678-9100

*Counsel for Plaintiff-Appellant Power Contracting, LLC*


March 30, 2026

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal.

**APPELLANT:** Power Contracting, LLC.

**ATTORNEYS FOR APPELLANT:**

Anna G. Rotman, P.C.
Allyson C. Arias
Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3600

Ruben A. Garcia
Garcia Firm PLLC
750 N. St. Paul Street, Suite 200
Dallas, TX 75201
Telephone: (817) 894-5469

Aaron L. Nielson
David Hutchison
Kirkland & Ellis LLP
401 W. 4th Street
Austin, TX 78701
Telephone: (512) 678-9100

Barira Munshi
Kirkland & Ellis LLP
4550 Travis Street
Dallas, TX 75205
Telephone: (214) 971-1770

**APPELLEE:** David Thurman.

**ATTORNEYS FOR APPELLEE:**

Warren W. Harris
Brian G. Patterson
Walter A. Simons
Carlton D. Wilde III
Jonathan Erick Sandlin
Matthew J. Reasoner
Caroline Thomas
Bracewell LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Telephone: (713) 223-2300

*s/ Aaron L. Nielson*
Counsel for Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Although summary reversal would be appropriate, Power Contracting, LLC ("Power") respectfully submits that oral argument may assist the Court's resolution of this appeal, which presents significant questions of contract and fiduciary-duty law respecting the responsibilities corporate executives owe their employers. Given the importance of the questions presented and the complexity of the factual record, oral argument is warranted.

## TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS .................... i

STATEMENT REGARDING ORAL ARGUMENT .................... ii

TABLE OF AUTHORITIES .................... v

INTRODUCTION .................... 1

STATEMENT OF JURISDICTION .................... 3

STATEMENT OF ISSUES .................... 4

STATEMENT OF THE CASE AND FACTS .................... 4

A. Thurman's Employment Agreement with Power .................... 4

B. Thurman's Disloyal Scheme to Harm Power .................... 8

C. Procedural History .................... 11

SUMMARY OF ARGUMENT .................... 15

STANDARD OF REVIEW .................... 19

ARGUMENT .................... 20

I. The District Court Erroneously Dismissed Power's Breach-of-Contract Claims .................... 20

A. The Restrictive Covenants Protect Mesa's Successors .................... 20

B. The District Court Misapplied Fundamental Contract Law. .................... 28

C. Alternatively, the District Court Erred in Granting Summary Judgment on Power's Reformation Claim. .................... 35

II. The District Court Was Wrong to Grant Summary Judgment on Power's Breach-of-Fiduciary-Duty Claim .................... 41

A. There Is a Genuine Dispute of Fact Whether Thurman Solicited Golden. ....................................................42

B. There Is a Genuine Dispute of Fact About Whether Thurman's Solicitation Was a Proximate Cause of Power's Injuries. ....................................................49

C. The District Court Wrongly Required Independent Damages for Thurman's Disclosure of Confidential Information....................................................53

III. The District Court Erroneously Granted Thurman Advancement and Indemnification. ....................................................56

A. Thurman Has No Right to Advancement or Indemnification. ....................................................57

B. The District Court Misapplied the Operating Agreement. ....................................................61

CONCLUSION ....................................................67

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abetter Trucking Co. v. Arizpe*,
113 S.W.3d 503 (Tex. App.—Houston 2003) ....................................42, 44, 46

*All Metals Fabricating, Inc. v. Ramer Concrete, Inc.*,
338 S.W.3d 557 (Tex. App.—El Paso 2009)............................................24, 25

*AmeriPath, Inc. v. Hebert*,
447 S.W.3d 319 (Tex. App.—Dallas 2014)...................................................43

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...........................................................................................38

*In re Athans*,
478 S.W.3d 128 (Tex. App.—Houston 2015, no pet.) ...............43, 45, 46, 48

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*,
590 S.W.3d 471 (Tex. 2019)..............................................................................21

*Bd. of Regents of Univ. of Tex. Sys. v. IDEXX Labs., Inc.*,
691 S.W.3d 438 (Tex. 2024)........................................................................28, 29

*Bell v. Harrell*,
653 S.W.3d 14 (Tex. App.—Amarillo 2022)..................................................39

*Berk v. Choy*,
146 S.Ct. 546 (2026).............................................................................................55

*Brinker v. Wobaco Tr. Ltd.*,
610 S.W.2d 160 (Tex. App.—Texarkana 1980, writ ref'd) ..........................59

*Caliber Home Loans, Inc. v. Cove*,
2025 WL 71983 (N.D. Tex. Jan. 10, 2025)......................................................50

*Centurion Logistics LLC v. Brenner*,
2024 WL 5244618 (Tex. App.—Dallas Dec. 30, 2024, pet. denied) ....................53

*Cherokee Water Co. v. Forderhause*,
741 S.W.2d 377 (Tex. 1987)....................35

*Clark v. Sweeney*,
607 U.S. 7 (2025)....................46

*Coe v. DNOW LP*,
718 S.W.3d 338 (Tex. App.—Houston 2025) ....................43, 45, 48

*Cory v. Stewart*,
103 F.4th 1067 (5th Cir. 2024)....................19, 47, 52

*Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*,
555 U.S. 271 (2009)....................47

*D'Onofrio v. Vacation Publ'ns, Inc.*,
888 F.3d 197 (5th Cir. 2018)....................41

*In re Dallas County*,
697 S.W.3d 142 (Tex. 2024)....................24, 35

*In re Deepwater Horizon*,
48 F.4th 378 (5th Cir. 2022)....................47

*Del Lago Partners, Inc. v. Smith*,
307 S.W.3d 762 (Tex. 2010)....................49

*Domain Prot., LLC v. Sea Wasp, LLC*,
23 F.4th 529 (5th Cir. 2022)....................61

*Dyer v. Houston*,
964 F.3d 374 (5th Cir. 2020)....................19

*Emps. Reinsurance Corp. v. Gordon*,
209 S.W.3d 913 (Tex. App.—Texarkana 2006) ....................29

*Eurecat US, Inc. v. Marklund*,
527 S.W.3d 367 (Tex. App.—Houston 2017, no pet.) ....................................46

*First United Pentecostal Church of Beaumont v. Parker*,
514 S.W.3d 214 (Tex. 2017)..........................................................................54

*Frazier v. Maxwell*,
2025 WL 494699 (Tex. App.—Fort Worth Feb. 13, 2025,
pet. denied) (en banc) ...................................................................................24

*Frost Nat. Bank v. L&F Distribs., Ltd.*,
165 S.W.3d 310 (Tex. 2005)..........................................................................23

*Gonzalez v. Mid-Continent Casualty Co.*,
969 F.3d 554 (5th Cir. 2020)...................................................................59, 64

*Great Am. Ins. v. Primo*,
512 S.W.3d 890 (Tex. 2017)..........................................................................31

*Guzman v. Allstate Assurance Co.*,
18 F.4th 157 (5th Cir. 2021)..........................................................................51

*Hardy v. Bennefield*,
368 S.W.3d 643 (Tex. App.—Tyler 2012) ..............................................35, 39

*Helping Hands Home Care, Inc. v. Home Health of Tarrant Cnty., Inc.*,
393 S.W.3d 492 (Tex. App.—Dallas 2013)....................................................48

*Hernandez v. Combined Ins. Co. of Am.*,
2021 WL 520456 (Tex. App.—Fort Worth Feb. 11, 2021)............................45

*HM Int'l, LLC. v. Twin City Fire Ins.*,
13 F.4th 356 (5th Cir. 2021)..........................................................................31

*Homeland Express, LLC v. Seale*,
420 S.W.3d 145 (Tex. App.—El Paso 2012, no pet.)....................................52

*Int'l Paper Co. v. Corporex Constructors, Inc.*,
385 S.E.2d 553 (N.C. App. 1989)..................................................................65

*Johnson v. City of Shelby*,
574 U.S. 10 (2014) ... 55

*Kachina Pipeline Co. v. Lillis*,
471 S.W.3d 445 (Tex. 2015) ... 31

*Lee Lewis Constr., Inc. v. Harrison*,
70 S.W.3d 778 (Tex. 2001) ... 49

*Lexon Ins. v. FDIC*,
7 F.4th 315 (5th Cir. 2021) ... 22

*Man Roland, Inc. v. Kreitz Motor Express, Inc.*,
438 F.3d 476 (5th Cir. 2006) ... 52

*Meaux Surface Prot., Inc. v. Fogleman*,
607 F.3d 161 (5th Cir. 2010) ... 43, 48, 50

*Microsoft Corp. v. i4i Ltd.*,
564 U.S. 91 (2011) ... 61

*Mid-Continent Cas. Co. v. Bay Rock Operating Co.*,
614 F.3d 105 (5th Cir. 2010) ... 21, 35

*Mikob Props., Inc. v. Joachim*,
468 S.W.3d 587 (Tex. App.—Dallas 2015) ... 24

*Mission Pharmacal Co. v. Molecular Biologicals, Inc.*,
112 F.4th 337 (5th Cir. 2024) ... 27, 30

*Navigant Consulting, Inc. v. Wilkinson*,
508 F.3d 277 (5th Cir. 2007) ... 42, 43, 46, 48, 50

*Neurodiagnostic Consultants, LLC v. Nallia*,
2019 WL 4231232 (Tex. App.—Austin Sept. 6, 2019) ... 43, 45

*Owen v. Kerr-McGee Corp.*,
698 F.2d 236 (5th Cir. 1983) ... 41

*Peterson v. Bell Helicopter Textron, Inc.*,
806 F.3d 335 (5th Cir. 2015) ... 55

*Providence Title Co. v. Truly Title, Inc.*,
2024 WL 3927229 (E.D. Tex. Aug. 22, 2024) ....................................46

*Ray Mart Inc. v. Stock Bldg. Supply of Tex. LP*,
302 F.App'x 232 (5th Cir. 2008) ....................................43

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)....................................52

*Roe v. Cypress-Fairbanks Indep. Sch. Dist.*,
53 F.4th 334 (5th Cir. 2022)....................................52

*Rogers v. Zanetti*,
518 S.W.3d 394 (Tex. 2017)....................................49

*Rosetta Res. Operating, LP v. Martin*,
645 S.W.3d 212 (Tex. 2022)....................................20, 21

*Ryder Integrated Logistics, Inc. v. Fayette County*,
453 S.W.3d 922 (Tex. 2015)....................................49, 50

*S. Seeding Serv., Inc. v. W.C. Eng., Inc.*,
719 S.E.2d 211 (N.C. App. 2011)....................................57

*Saden v. Smith*,
415 S.W.3d 450 (Tex. App.—Houston 2013) ....................................54

*Safeco Ins. v. Rehab. Specialists*,
1994 WL 144778 (5th Cir. Apr. 7, 1994)....................................39

*Schwartz v. Jefferson*,
520 S.W.2d 881 (Tex. 1975)....................................58

*Simmons v. Pac. Bells, LLC*,
787 F.App'x 837 (5th Cir. 2019) ....................................38

*Simpson v. Curtis*,
351 S.W.3d 374 (Tex. App.—Tyler 2010) ....................................35, 39

*SK Plymouth, LLC v. Simmons*,
605 S.W.3d 706 (Tex. App.—Houston 2020) ....................................39

*State v. Philip Morris USA Inc.*,
685 S.E.2d 85 (N.C. 2009) .......... 57

*Sw. Bell Tel. Co. v. Wilson*,
768 S.W.2d 755 (Tex. App.—Corpus Christi-Edinburg 1988) .......... 54

*T.M.C.S., Inc. v. Marco Contractors, Inc.*,
780 S.E.2d 588 (N.C. App. 2015) .......... 64

*Tech. Automation Servs. Corp. v. Liberty Surplus Ins.*,
673 F.3d 399 (5th Cir. 2012) .......... 35

*Tex. Pac. Land Corp. v. Horizon Kinetics LLC*,
306 A.3d 530 (Del. Ch. 2023) .......... 62

*Tolan v. Cotton*,
572 U.S. 650 (2014) .......... 47, 51

*Town of Greece v. Galloway*,
572 U.S. 565 (2014) .......... 39

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) .......... 46

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*,
578 S.W.3d 506 (Tex. 2019) .......... 50

*URI, Inc. v. Kleberg County*,
543 S.W.3d 755 (Tex. 2018) .......... 30

*Valence Operating Co. v. Dorsett*,
164 S.W.3d 656 (Tex. 2005) .......... 20, 29

*Van Dyke v. Navigator Grp.*,
668 S.W.3d 353 (Tex. 2023) .......... 21, 28, 29

*Vanguard Pai Lung, LLC v. Moody*,
2020 WL 4477043 (N.C. Super. Aug. 4, 2020) .......... 57

*Weaver v. Metro. Life Ins.*,
939 F.3d 618 (5th Cir. 2019) .......... 23, 30, 31

*Weston v. City Council of Charleston*,
27 U.S. 449 (1829)....................................................................................59

*Williams v. Glash*,
789 S.W.2d 261 (Tex. 1990)......................................................................39

*Wooters v. Unitech Int'l, Inc.*,
513 S.W.3d 754 (Tex. App.—Houston 2017) ..........................................46

*WorldVue Connect Glob., LLC v. Szuch*,
155 F.4th 472 (5th Cir. 2025)......................................................................20

**Statutes**

28 U.S.C. §1291..............................................................................................3

28 U.S.C. §1332..............................................................................................3

**Rules**

Fed. R. Civ. P. 54..........................................................................................55

Fed. R. Civ. P. 56..................................................................................2, 47, 49

Fed. R. Civ. P. 59(e) .......................................................................................46

**Other Authorities**

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE
INTERPRETATION OF LEGAL TEXTS (2012).....................................24, 31, 34, 35

BLACK'S LAW DICTIONARY (12th ed. 2024) ...................................................58

MODEL BUS. CORP. ACT §8.50 (A.B.A. 2025) ..............................................58

*Quanta Services, Inc.*, YAHOO FINANCE (Mar. 2026) ...........................................4

WEBSTER'S NEW INT'L DICTIONARY (2d ed. 1934).......................................58, 60

28 WILLISTON ON CONTRACTS (4th ed.) .........................................................39

## INTRODUCTION

Despite receiving millions of dollars over the years in salary and bonuses, David Thurman—the Vice President of Power Contracting, LLC—hatched a scheme to jump ship to a subsidiary of Power's $80-billion competitor, Quanta Services, Inc. Thurman also recruited another key Power employee, Travis Golden, to defect with him, going so far as to draft Golden's offer letter. And to carry out this plot, he divulged highly sensitive, confidential information to Quanta.

Thurman's disloyalty breached the non-compete, non-disclosure, and non-solicitation covenants of his employment agreement and flouted his fiduciary duty to Power. What's worse, he did it on purpose. Before pulling the trigger, Thurman admitted privately that he may need to "pay a penalty" and find "a lawyer to get out of" his employment agreement. ROA.1820-21. Quanta ultimately solved the problem for him by agreeing to pay his legal bills. ROA.3358. Yet when Power sued to enforce its rights, the district court denied Power any relief and awarded *Thurman* millions of dollars in advancement and indemnification.

None of this was proper. Under the district court's reading of Thurman's employment agreement, Power's contract rights—in that court's

words—"lack any practical effect." ROA.585. The court pressed ahead anyway. And the court's summary-judgment analysis is indefensible. For example, with respect to whether Thurman breached his fiduciary duty, the court *sua sponte* granted summary judgment to Thurman, disregarding Thurman's own argument that this issue must go to a jury. The Court regularly reverses less grievous misapplications of Rule 56.

And as a final error, the court ordered Power to indemnify Thurman, even though Power's operating agreement expressly precludes indemnification where the subject of the litigation is Thurman's own employment agreement or where (as here) Thurman brings counterclaims without authorization. The agreement also unambiguously provides that Thurman can only receive advancement and indemnification for "good faith" conduct that is not against Power's "best interests." Dkt.100-2, §§2.7(b), (f). Yet conspiring with Power's direct competitor, poaching a key employee, and divulging Power's confidential information is anything but "good faith" conduct in Power's "best interests."

In short, despite pocketing Power's money, Thurman breached his contract. Rather than protecting Power's best interest, he betrayed Power, even conspiring with Quanta to solicit a key employee. By any fair standard,

Thurman is the bad actor. But instead of protecting the victim, the court rewarded the bully. The court read key terms of Thurman's contract to mean nothing, botched summary judgment, and ordered Power to pay millions of dollars in indemnification to a disloyal executive who—whatever else can said—deliberately injured Power. This Court should set things right by reversing the district court.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §1332 because the amount in controversy exceeds $75,000 and complete diversity exists. ROA.635. Power is a citizen of North Carolina because its sole member is Pike Enterprises, LLC, and Pike Enterprises, LLC's sole member is Pike Corporation, which is incorporated in North Carolina and has its principal place of business there. ROA.519. Thurman is domiciled in Texas. ROA.635. This Court has jurisdiction under 28 U.S.C. §1291 because Power timely appealed the amended final judgment. ROA.4721, 4724.

## STATEMENT OF ISSUES

1. Whether the district court—in reaching a decision that admittedly deprives Thurman's employment agreement of "any practical effect"—erred in dismissing Power's breach-of-contract claims or granting

summary judgment for Thurman on Power's reformation claim.

2. Whether the district court erred in granting summary judgment for Thurman on Power's breach-of-fiduciary-duty claim, including doing so *sua sponte* regarding whether Thurman breached his duty.

3. Whether the district court erred in granting summary judgment for Thurman on his advancement and indemnification counterclaims.

## STATEMENT OF THE CASE AND FACTS

### A. Thurman's Employment Agreement with Power

**1.** Power provides electrical services in several markets, including Houston, Texas. ROA.636. Quanta is an $80 billion company. *Quanta Services, Inc.*, YAHOO FINANCE (Mar. 2026), https://tinyurl.com/4txnceev. North Houston Pole Line ("NHPL") is a Quanta subsidiary and Power's main competitor in Houston. ROA.633.[1] Although now merged into Power (as detailed below), Mesa Line Services, LLC ("Mesa") was an electrical infrastructure company. ROA.637-38. Thurman was a "Founder" (one of two) and "Executive" of Mesa. ROA.59-60, 637, 1698.

**2.** In 2017, Entregado Group, Inc. ("Entregado"), a private equity

[1] This brief refers to Quanta Services, Inc. and NHPL together as "Quanta."

group, acquired Mesa. ROA.639. EG Holding I Corp. ("Holdings") was a holding company that indirectly owned Entregado. ROA.639. Holdings did not have employees, operations, or markets. ROA.639.

When Entregado acquired Mesa, Thurman signed a new employment agreement. ROA.639. Only Mesa ("the Company") and Thurman ("the Executive") were "Parties" to that agreement. ROA.59.[2] "[T]he Parties" entered the contract "in consideration of the mutual covenants contained [t]herein," including Thurman's receipt of a $2.6 million bonus and stock options. ROA.59. In exchange, Thurman agreed "to be bound by" three "restrictive covenants." ROA.59.

*First*, the non-disclosure provision recognizes that Thurman will obtain "Confidential Information" because of his "position with the Company." ROA.63, §4.1. "Confidential Information" includes several categories of information "of the Company Group" and other "information considered by the Company Group to be confidential." *Id.* This provision bars Thurman from disclosing "such information in any manner other than

---

[2] The agreement included Holdings "solely for purposes of Section 2.3," a stock option provision not at issue here. ROA.59.

in connection with his employment with the Company," except if he obtains "the prior written consent of the Company." ROA.63-64, §4.1.

The agreement defines the "Company Group" as "Holdings and its direct and indirect subsidiaries and affiliates." ROA.63, §3.4. When Thurman and Mesa signed the employment agreement in 2017, Mesa was Holdings' subsidiary and thus a member of the Company Group. ROA.640.

*Second*, the non-compete provision bars Thurman from working for "any Restricted Enterprise" for "three years following" his termination. ROA. 64, §4.2. A "Restricted Enterprise" refers to "any business which is in material competition with the business of any member of the Company Group in Texas, Louisiana, Arkansas, Oklahoma, New Mexico, and any other U.S. state in which any member of the Company Group has material operations or markets." *Id.* Additionally, "upon request of the Company," Thurman "shall notify the Company" of his "employment status." *Id.*

*Third*, the non-solicitation provision bars Thurman from "solicit[ing] … for employment … an employee of any member of the Company Group" for three years post-termination. ROA.64-65, §4.3. The provision "cover[s]" "current or former employee[s] of the Company." ROA.65, §4.3.

Thurman's employment agreement also includes remedial provisions,

including that "any breach of the terms of this Section 4"—the section containing the non-disclosure, non-compete, and non-solicitation provisions—"would result in irreparable injury and damage to the Company Group for which the Company would have no adequate remedy at law." ROA.66, §4.8. Accordingly, "the Company shall be entitled to an immediate injunction and restraining order to prevent such breach" by Thurman "in addition to any other remedies to which the Company may be entitled." *Id.* "[A]ny member of the Company Group may enforce the provisions of Section 4." ROA.67, §8.3.

Critically, the agreement makes clear that Mesa's successor—or even a company that purchases Mesa's assets—steps into Mesa's shoes and must be able to benefit from the contract. The "Agreement shall inure to the benefit of, and be binding on, the successors and assigns of each of the parties, including, without limitation, … any successor to all or substantially all of the business and/or assets of the Company." ROA.69, §8.10.

**3.** When the employment agreement was signed, Mesa was owned by Entregado, which was owned by Holdings, and ultimately, AEA Investors LP ("AEA"). ROA.67, 639-40. In April 2021, Mesa changed ownership from AEA to Fidus Investment Corporation. Dkt.121-2, 96. At this

point, Mesa was no longer affiliated with Holdings. In December 2021, Mesa's ownership changed again when Pike Enterprises, LLC ("Pike")—Power's parent—acquired Entregado. ROA.646, 693. Thurman agreed at that time that his "employment agreement … shall remain in full force and effect," and in the same document released any claims in exchange for a $950,000 bonus. ROA.646, 695.

In May 2022, Holdings voluntarily dissolved. ROA.892. For a period, Pike maintained Mesa as a standalone entity but, in December 2022, Pike merged Mesa into Power, ROA.646, and Thurman became Power's Vice President, ROA.631. Because Mesa merged into Power, Power is now Mesa's successor and retains Mesa's rights under the agreement. ROA.646.

### B. Thurman's Disloyalty

Thurman became "frustrated" in May 2022 and considered "leaving" Mesa. Dkt.121-2, 155-58. Thurman confided in Golden, another senior employee, that he had spoken with Quanta. ROA.1820-21. Thurman confessed, however, that he "[m]ight need a lawyer to get out of" his contract and someone "might have to pay a penalty" to "release" him. ROA.1820-21.

Soon afterwards, Thurman sent Daren Austin, a Quanta Senior Vice President, four confidential documents: Thurman's employment agreement,

stock option agreement, and bonus and release agreement, as well as a Mesa "winding down" memo. Dkt.121-13&15. Each contained highly sensitive, confidential information that could be used to Power's disadvantage. *E.g.*, Dkt.121-2, 169-78, 196-97; Dkt.121-6, 160-61. Austin thereafter explained to Thurman that Quanta's concern over his employment agreement was "bigger and deeper than we thought," so any move "wasn't going to happen" at that time. Dkt.121-2, 162-64. Accordingly, things "went dormant" for a while. ROA.3522.

Thurman's efforts to defect to Quanta began to heat up again in September 2023. ROA.1839. Throughout the fall, Thurman regularly used his wife's email address to contact Bo Cassidy, a Quanta regional president. ROA.1839. Thurman agreed to "keep things confidential and super quiet." ROA.1842. Finally, on December 4, Thurman received an offer from NHPL. ROA.1844. After requesting that Cassidy delete language from that offer attesting that Thurman was not subject to a non-compete agreement, Thurman signed a revised offer on December 18. ROA.1845, 1848, 1870.

Thurman then commenced a campaign to recruit Golden. Quanta had flirted with Golden in the past (even once offering but then rescinding a job because Golden took too long to make up his mind, ROA.3221-23), and

Golden had interviewed with Quanta over seven months prior, ROA.3247. Thurman sought to "push [] forward" the process. ROA.3525. He began by speaking with Cassidy. ROA.1874, 3525. Then Thurman personally drafted an offer letter for Golden on behalf of Quanta using NHPL letterhead, with Thurman selecting the terms. ROA.3525; Dkt.121-28. He sent the letter to Cassidy to continue "push[ing] … forward" Golden's potential employment. ROA.3525. Despite still being paid by Power, Thurman sent that letter during business hours and even used his Power email address. ROA.689.

When Cassidy failed to make Golden an offer, Thurman pressed him in follow-up texts in which Thurman shared confidential information about Golden's compensation. ROA.1748, 1879, 3525-26. He also tried to persuade Golden to take the deal. Although Quanta would provide "less of a salary," Thurman emphasized "there would be bonus potential and opportunity that would outweigh the salary." ROA.1748, 3527.

Thurman's centrality to Golden's recruitment is apparent. For example, on December 28, just three minutes after Thurman texted Cassidy about Golden's potential hiring, Cassidy informed Golden that Cassidy was "working on [his] package" and would "make it work." ROA.1884, 3526. On

January 2, 2024, Thurman shared Golden's personal email address so Cassidy could send an offer. ROA.1887. The next day, Golden received an offer identical to what Thurman drafted. ROA.1889; Dkt.121-28.

Although Golden signed that offer, he was still unsure whether to resign from Power. Golden "wanted to make 100 percent sure" that his new position "was good" first. Dkt.180-3, 338. On January 11, he texted Cassidy to see whether things were "100% good." Dkt.180-4. After Cassidy's reassurance, Thurman and Golden resigned. Dkt.180-4; Dkt.121-35, 83. Losing Golden was a significant blow. One executive had to finish his projects and Power incurred considerable costs in replacing him. Dkt.121-30, 38, 53, 122-23.

### C. Procedural History

Power sued Thurman in the Southern District of Texas on March 19, 2024. ROA.24, 55. Power sought a temporary restraining order, which the district court denied. ROA.491-92.

Power amended its complaint, bringing breach-of-contract, breach-of-fiduciary-duty, and reformation claims. ROA.249, 270-80. Thurman moved to dismiss. ROA.400. The court denied Thurman's motion as to Power's fiduciary-duty and reformation claims but dismissed Power's breach-of-

contract claim. ROA.594-95. According to the court, the covenants in Thurman's employment agreement became inoperative in May 2022 when Holdings dissolved. ROA.585-86. The court did not claim that Mesa or Thurman (the parties to the agreement) intended that outcome, nor did the court dispute that this reading means that Thurman's employment agreement no longer has "any practical effect." ROA.585.

Power filed a second amended complaint, bringing breach-of-contract claims, a reformation claim, and a fiduciary-duty claim. ROA.627, 654-67. Thurman moved to dismiss the breach-of-contract claims. ROA.931. The court granted the motion, largely repeating its prior analysis. ROA.2844.

Even though Quanta has funded Thurman's defense throughout this litigation, ROA.3358, Thurman brought counterclaims seeking advancement and indemnification for costs defending against Power's reformation and fiduciary-duty claims, Dkt.100. Power sought a declaratory judgment that advancement and indemnification are barred, and the parties each moved for summary judgment. ROA.3098, 3320. The court sided with Thurman on advancement respecting Power's fiduciary-duty claim but granted Power's motion regarding reformation, reasoning that the bar on advancement and indemnification in Power's operating agreement (a separate agreement

offering additional protection to Power's leaders) does not extend to fiduciary-duty claims. ROA.4029-32, 4037; *see also* ROA.2994 (denying motion to dismiss).

The parties also filed cross-motions for summary judgment on Power's claims. Power moved for summary judgment on its fiduciary-duty claim. ROA.1699. Thurman moved for summary judgment based on an alleged lack of causation and injury—not lack of breach. ROA.3209. Thurman also sought summary judgment on Power's reformation claim. ROA.3203.

For these claims, the court granted summary judgment to Thurman across the board. ROA.4629-30. As to the fiduciary-duty claim, for example, the court *sua sponte* determined that no breach occurred, ROA.4618, despite *Thurman's* argument that there is a factual dispute, ROA.3495. The court also found a lack of causation, concluding that no reasonable juror could conclude that Thurman's recruitment efforts caused Golden to leave. ROA.4620-21. And as for reformation, the court did not dispute that there is no business reason why Mesa would have agreed to allow Thurman's covenants to become effectively null upon Holdings' dissolution. Nonetheless, the court ruled that no reasonable juror could conclude that Power stated the elements of a reformation claim. ROA.4604-05.

With Power's claims dismissed, the court turned to indemnity. It *sua sponte* granted summary judgment for Thurman on his counterclaims for indemnity concerning Power's fiduciary-duty claim and denied Power's cross-motion. ROA.4624. The court also granted Thurman indemnity for seeking indemnity. ROA.4627-28. It relied on its prior reasoning rejecting Power's arguments that no indemnification is permitted because this "proceeding[]" "involv[es] the enforcement" of Thurman's employment agreement and because a "part" of the "proceeding" was "initiated" by Thurman without Power's consent. ROA.4626, 4026-30. And it rejected Power's arguments about Thurman's bad faith. ROA.4626-27. As with advancement, however, the court granted summary judgment for Power for indemnity concerning Power's reformation claim. ROA.4624.

The court issued a partial final judgment addressing the claims resolved at summary judgment. ROA.4674-75. Power moved for reconsideration, emphasizing factual disputes about Thurman's campaign to recruit Golden. ROA.4692, 4696. To avoid a damages trial on indemnification, the parties stipulated that damages were "equal to the attorney's fees and expenses that are the subject of [Thurman's] advancement and indemnification claims." ROA.4682.

On December 17, 2025, the court denied Power's reconsideration motion and entered a complete final judgment. ROA.4713. Two days later, the court withdrew its final judgment, requesting guidance on the amount of indemnity owed. ROA.4716-17. Unless Power prevails on appeal, that amount is $2,253,049.83, plus what Thurman's lawyers reasonably charge for appellate briefing and argument. ROA.4722-23. After the parties clarified the amount, the court entered an amended final judgment on January 27, 2026. ROA.4721. Power promptly filed a notice of appeal. ROA.4724.

## SUMMARY OF ARGUMENT

Successful business requires loyalty and confidentiality. Companies thus often pay senior executives handsomely to put the interests of their employers first. Market competition and investment would screech to a halt if companies could not depend on their executives' faithfulness.

Here, however, Thurman abused Power's trust by breaching his contractual and fiduciary duties. Thurman defected to a direct competitor despite a non-compete covenant, shared confidential information with that competitor despite a non-disclosure covenant, and solicited a key Power employee despite a non-solicitation covenant and in the teeth of his fiduciary duty. And he knew that he was not acting in Power's benefit. He negotiated

his contract with Quanta using his wife's email and deleted the attestation from Quanta's draft offer that he was not subject to a non-compete covenant. He also admitted that he may need "a lawyer" and for someone "to pay a penalty" for him to "get out of" his contract. ROA.1820-21.

In upholding Thurman's disloyalty, the district court sided with an industry Goliath while committing at least three fundamental errors.

**I.** The district court erred in dismissing Power's breach-of-contract claims. The restrictive covenants protect "any member of the Company Group," which is defined as "Holdings and its direct and indirect subsidiaries and affiliates." ROA.63-65, §§3.4, 4.1-.3. When the contract was entered, Mesa was a subsidiary of Holdings and thus a member of the Company Group. Because Power is Mesa's "successor[]," the covenants "inure to the benefit of" Power. ROA.69, §8.10. This is not just Power's opinion, moreover. Thurman recognized as much when, for example, he verified a suit against a former Mesa executive for breaching covenants identical to his own *after* Mesa was unaffiliated with Holdings.

The court, however, held that these covenants now "lack any practical effect" because Holdings—a holding company that never employed Thurman—has dissolved. ROA.585. That decision makes a hash out of a

contract between Mesa (and Mesa's successors) and Thurman. The court failed to interpret the phrase "Company Group" as used when the contract was adopted, failed to give meaning to the contract's core terms, and failed to consider the contract's structure, including multiple provisions that become inexplicable under the court's interpretation. At a minimum, Power's (and Thurman's pre-litigation) reading of the contract is at least reasonable, meaning the issue must go to a jury under Texas law.

Alternatively, the Court should reverse the grant of summary judgment on Power's reformation claim. There is a fact question whether the parties intended to continue protecting Thurman's then-employer whatever Holdings' status, as well as whether the parties made a mistake in reducing that agreement to writing. The contrary view—that the parties always intended for Thurman's contract to become meaningless if Holdings ever dissolved or disassociated with Mesa or its successors—defies commercial reality and ignores Thurman's pre-litigation understanding.

**II.** The district court also erred in granting summary judgment on Power's breach-of-fiduciary-duty claim. A fiduciary cannot solicit key employees to join a competitor. Whether solicitation occurred (breach) and whether that solicitation caused the employee's departure (causation) are

classic fact questions for a jury. Yet instead of allowing jurors to decide such fact questions, the court here *sua sponte* granted summary judgment to Thurman concerning breach.

That was error. The court misunderstood Texas law and turned the summary-judgment standard on its head. The court believed that Golden did not leave Power because of Thurman's recruitment. But a reasonable juror could disagree. Thurman badgered Cassidy about hiring Golden, drafted Golden's offer letter, sent that letter to Cassidy, and encouraged Golden to accept Quanta's spin that Golden's total compensation would be higher because of bonus opportunities. That is more than enough to send this issue to a jury. If nothing else, the court erred in granting summary judgment to Thurman respecting Thurman's disclosure of confidential information to Quanta. Thurman cannot plausibly defend such misconduct as consistent with his fiduciary duty to Power, yet the court rejected both damages and disgorgement.

**III.** The district court also erroneously granted advancement and indemnification. Two contractual limits defeat the court's analysis out of hand: (1) this is a "proceeding[]" "involving the enforcement of" an employment agreement and (2) "part" of this "proceeding" (Thurman's

counterclaims) was "initiated" by Thurman. Dkt.100-2 §2.7(k). Regardless, the facts show that advancement and indemnity are unwarranted for a third reason: Thurman did not remotely act in "good faith" or in Power's "best interests," Dkt.100-2, §§2.7(b), (f), or at least a jury could so conclude. The court's policy concerns are both irrelevant and wrong.

## STANDARD OF REVIEW

The Court reviews the grant of a motion to dismiss *de novo*, "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020).

For summary judgment, the Court applies "the same standard as the district court." *Cory v. Stewart*, 103 F.4th 1067, 1077 (5th Cir. 2024). Summary judgment thus is allowed only if "the movant establishes that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." *Id.* A court does not "*decide* factual disputes," but rather asks "whether there *are* material factual disputes." *Id.* The Court must "view all the facts and draw all reasonable inferences in favor of the nonmoving party." *Id.* at 1078. If the "nonmovant's evidence 'reasonably lead[s]' to the 'not implausible' conclusion that all the necessary legal elements are … met, summary judgment is improper." *Id.* at 1079.

## ARGUMENT

### I. The District Court Erroneously Dismissed Power's Breach-of-Contract Claims.

Thurman's employment agreement protects not just Mesa, but also Mesa's successors. The district court's reading, by contrast, makes Thurman's covenants dead letter. And if there is not even a jury question about what the contract means, then the court erred in rejecting Power's reformation claim. Thurman cannot have it both ways.

#### A. The Restrictive Covenants Protect Mesa's Successors.

Texas law governs the employment agreement. ROA.68, §8.5. In Texas, a restrictive covenant, like any other term, is governed by ordinary rules of contract interpretation. *See, e.g.*, *WorldVue Connect Glob., LLC v. Szuch*, 155 F.4th 472, 480 (5th Cir. 2025).

Under Texas law, "the primary concern" in contract interpretation "is to ascertain the true intentions of the parties as expressed in the instrument." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). Courts do so by "giving the language its plain, ordinary, generally accepted meaning, considering the context in which words are used, avoiding constructions that render provisions meaningless, and construing contract provisions together so as to give effect to the whole." *Rosetta Res. Operating, LP v. Martin*,

645 S.W.3d 212, 219 (Tex. 2022). In addition, "[w]ords must be given the meaning they had when the text was adopted." *Van Dyke v. Navigator Grp.*, 668 S.W.3d 353, 360 (Tex. 2023). And courts must "avoid" interpretations "that produce unreasonable, oppressive, or absurd results." *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 114 (5th Cir. 2010); *accord Rosetta*, 645 S.W.3d at 219. If a contract is unambiguous, courts "construe it as a matter of law." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019). "But if" it "contains two or more reasonable interpretations, the contract is ambiguous, creating a fact issue as to the parties' intent," which is a question "for the jury." *Id.* at 479-80.

Here, the covenants protect Power for at least four reasons. At a minimum, the contract is ambiguous, which would entitle Power to a jury. Either way, the Court must reverse.

**1.** Thurman's employment agreement protects "any member of the Company Group." ROA.63-65, §§4.1-.3. And it permits "any member of the Company Group" to "enforce the provisions of Section 4." ROA.67, §8.3.

The key question, therefore, is which entities fall within "the Company Group." The employment agreement, however, answers that question. The "Company Group" is defined as "Holdings *and its direct and indirect*

*subsidiaries and affiliates*." ROA.63, §3.4 (emphasis added). When the contract was adopted, Mesa—Thurman's employer, and the other party to the contract—was a subsidiary of Holdings. ROA.640. Mesa thus received the full protection of and independent rights to enforce each covenant.

Power, as Mesa's successor, ROA.646, enjoys the same rights. The contract "shall inure to the benefit of, and be binding on, the successors and assigns of each of the *parties*, including, without limitation, … *any* successor to all or substantially all of the business *and/or assets* of the Company." ROA.69, §8.10 (emphasis added). The parties thus intended that *any* member of the Company Group and *any* successors (including Power) are protected by and can enforce the covenants. *See, e.g.*, *Lexon Ins. v. FDIC*, 7 F.4th 315, 323 (5th Cir. 2021) (emphasizing the "expansive[ness]" of "any"). This provision is also clear that such protections continue even if Holdings is no longer connected with Mesa or Mesa's successors. For example, if there is an "asset[]" sale (as this provision allows), then Holdings' connection would be severed, but the protections still would "inure to the benefit" of the acquiror. ROA.69, §8.10.

**2.** The benefits-and-binding-effect provision in Thurman's employment agreement independently establishes that the restrictive

covenants protect Power. As noted, the "Employment Agreement shall inure *to the benefit of, and be binding on*, the successors and assigns of each of the *parties*." ROA.69, §8.10 (emphasis added). Yet Mesa and Thurman are the only "parties" to Thurman's covenants. ROA.59. Because the "Agreement" includes the covenants—indeed, they are its centerpiece—Thurman is bound by them. Thurman therefore cannot compete with Mesa, disclose its confidential information, or solicit its employees. And as Mesa's successor, Power retains the benefit of those covenants. ROA.69, §8.10.

**3.** Numerous "contextual cues" confirm that Mesa (and so Power) are protected. *Weaver v. Metro. Life Ins.*, 939 F.3d 618, 626 (5th Cir. 2019).

*First*, the provisions are by and between Mesa and Thurman. ROA.59. Indeed, the contract is "by and between" Holdings "*solely* for purposes of Section 2.3," an irrelevant stock options provision. ROA.59-60 (emphasis added). It makes no sense to say (as the court did) that Mesa, a party to the contract, stopped being protected by the contract's core provisions. Texas courts do not read contracts to invite commercial "unreasonable[ness]." *E.g.*, *Frost Nat. Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005). And more generally, courts "resist rulings anchored in hypertechnical readings of isolated words or phrases," but instead enforce "'the *fair meaning* of the

text.'" *Frazier v. Maxwell*, 2025 WL 494699, at *3 (Tex. App.—Fort Worth Feb. 13, 2025, pet. denied) (en banc) (quoting *In re Dallas County*, 697 S.W.3d 142, 158 (Tex. 2024), in turn quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 356 (2012)). Here, for example, given that the agreement makes no sense unless a "benefit" could "inure" to each "part[y's]" "successor," ROA.69, §8.10, the court's hypertechnical, isolated reading is not remotely a fair meaning.

*Second*, the recitals make no sense if Mesa—now Power—is not protected. Although recitals are not "controlling, they are part" of a court's "consideration of the agreement in its entirety." *Mikob Props., Inc. v. Joachim*, 468 S.W.3d 587, 596 n.4 (Tex. App.—Dallas 2015). Recitals, therefore, "should be reconciled with the operative clauses and given effect, so far as possible." *All Metals Fabricating, Inc. v. Ramer Concrete, Inc.*, 338 S.W.3d 557, 561 (Tex. App.—El Paso 2009). Here, the recitals provide that "in consideration of the *mutual* covenants contained herein … the Parties hereto"—i.e., Thurman and Mesa—"agree as follows." ROA.59 (emphasis added). That language is inexplicable unless the restrictive covenants are between Mesa and Thurman.

*Third*, the restrictive covenants focus on Mesa—not Holdings. For

example, the non-disclosure provision mentions "the Company" (Mesa) no less than ten times. ROA.63-64, §4.1. It explains that Thurman will obtain confidential information because of his "position with the Company," that he may only use such information "in connection with his employment with the Company," that he does not violate the non-disclosure duty if he obtains "the prior written consent of the Company," and that upon termination he "shall promptly supply to the Company all property" obtained during his "employment with the Company." *Id.* Mesa is the source of confidential information, Thurman owes duties to Mesa regarding such information, and Mesa alone may consent to Thurman's disclosure of that information.

Similarly, the non-compete provision prohibits Thurman from working for a business "in material competition with the business of any member of the Company Group in Texas, Louisiana, Arkansas, Oklahoma, New Mexico," or where there are "material operations or markets." ROA.64, §4.2. Holdings—as a holding company—did not have *any* competitors, operations, or markets, let alone "material" ones. ROA.639, 657. Mesa, by contrast, had them in Texas, Louisiana, and Arkansas. ROA.657. Thurman also owed Mesa (not Holdings) a duty to "notify" it of his "employment status" upon Mesa's request. ROA.64, §4.2.

For its part, the non-solicitation provision bars soliciting employees "of any member of the Company Group." ROA.64-65, §4.3. But Holdings had no employees. ROA.628, 639. Mesa thus must be the protected entity. That conclusion is confirmed, moreover, by the next sentence, which states the provision "cover[s]" "current or former employee[s] of *the Company*." ROA.65, §4.3 (emphasis added). Yet "the Company" is Mesa (now Power).

*Fourth*, the remedies provision declares that Mesa could sue Thurman for breaching the covenants because otherwise "*the Company* would have no adequate remedy at law." ROA.66, §4.8 (emphasis added). So "*the Company* shall be entitled to an immediate injunction and restraining order to prevent such breach … in addition to any other remedies to which *the Company* may be entitled at law or in equity." *Id.* (emphasis added). And "this paragraph shall not prevent *the Company* from pursuing any other available remedies for any breach." *Id.* (emphasis added). Holdings, however, is not "the Company." None of this language makes sense if the covenants do not protect "the Company"—which is Mesa (now Power).

*Fifth*, the third-party-beneficiaries provision states that the contract does not "confer upon any Person *not a party* to this Employment Agreement … any rights or remedies of any nature or kind … except … (ii) any member

of the Company Group may enforce the provisions of Section 4." ROA.67, §8.3 (emphasis added). The implication therefore is that Mesa, as one of the two parties to the agreement, *does* have "rights." The upshot is that Power, as Mesa's successor, can enforce the restrictive covenants.

**4.** Finally, Quanta's views—backed by common sense—confirm that the agreement is at least ambiguous. After Pike (Power's parent) acquired Mesa in December 2021, Mesa and Holdings no longer were affiliated. Yet upon reviewing Thurman's agreement—which he surreptitiously provided in violation of his non-disclosure duties—Quanta concluded it was a "bigger and deeper [problem] than we thought." Dkt.121-2, 162-64. Even if Thurman's pre-litigation view that the covenants still apply constitutes parole evidence (which is debatable, given that he was speaking as a seasoned executive in a specialized industry), Quanta's concerns offered against interest by a sophisticated non-party shed light on "industry custom," which Texas courts recognize "as a means of *identifying* ambiguity, not just resolving it." *Mission Pharmacal Co. v. Molecular Biologicals, Inc.*, 112 F.4th 337, 342 n.2 (5th Cir. 2024).

That point is reinforced by common sense. If Thurman's restrictive covenants no longer had effect, Power's *Vice President* would not be

contractually bound to protect Power's confidential information. No company would agree to that. Courts read contracts "not in the abstract but in the context in which the words appear and were written—the realities they were meant to address." *Bd. of Regents of Univ. of Tex. Sys. v. IDEXX Labs., Inc.*, 691 S.W.3d 438, 445 (Tex. 2024). If nothing else, Quanta's assessment confirms that Power's reading is at least reasonable.

**B. The District Court Misapplied Fundamental Contract Law.**

Despite the foregoing, the district court held that "the Restrictive Covenants specifically protect [Holdings], a separate holding company, not Power Contracting or Mesa." ROA.585. Because Holdings dissolved, the court reasoned, "the covenants lack any practical effect and, therefore, cannot be enforced by Power." ROA.585. That conclusion runs headlong into at least three principles of contract interpretation.

**1.** The court misapplied the principle that a contract "retains the same meaning today that it had when it was drafted." *Van Dyke*, 668 S.W.3d at 359.

The court reasoned that "subsequent events destroyed the agreement's practical effect," because when Holdings dissolved, "there were no longer any members of the Company Group, and thus, no promise to enforce."

ROA.590. But "the ordinary meaning at the time of drafting remains the meaning to which courts must later adhere." *Van Dyke*, 668 S.W.3d at 359-60. When the contract was formed, Mesa *existed*, and its successors at that time were—even under the court's view—protected. Several years later when Holdings dissolved, that protection supposedly vanished. Yet an "agreement is viewed as of the time it was made, not in the light of subsequent events." *Emps. Reinsurance Corp. v. Gordon*, 209 S.W.3d 913, 917 (Tex. App.—Texarkana 2006).

The court's response was that meaning is fixed even if effects fluctuate. But parties enter contracts to obtain effects. Courts thus cannot ignore the "realities" that contracts are "meant to address." *IDEXX Labs.*, 691 S.W.3d at 445. The court disregarded that rule—and the fact that the contract made room for fluctuation through the successor provision.

**2.** The court also failed to "examine and consider the entire writing," and thus did not "harmonize … all the provisions of the contract." *Valence Operating*, 164 S.W.3d at 662. The court reasoned as follows: The restrictive covenants "protect the 'Company Group,'" which "is defined as 'Holdings and its direct and indirect subsidiaries and affiliates.'" ROA.585-86. Because Holdings "dissolved," it "does not have subsidiaries or

affiliates" anymore. ROA.585. Thus, even though Mesa *was* a Holdings' subsidiary when Thurman signed his employment agreement, as of the time of this litigation, "the Company Group consists of *zero* legal entities," and there are "no members to enforce the covenants." ROA.586.

But the court ignored "contextual cues" that Mesa (now Power) is protected. *Weaver*, 939 F.3d at 626. The court did not acknowledge that Mesa, not Holdings, was a *party* to Thurman's employment agreement. The court also did not consider the recitals, remedies provision, or the third-party-beneficiaries provision, and admittedly treated the successor provision as "toothless." ROA.589. Instead, it rested its analysis on three words—"the Company Group." ROA.586. The court also refused to consider that Mesa was an operating business and Thurman's employer, characterizing such facts as only going to "subjective intent." ROA.586-87.

Not so. "Context" includes, for example, the agreement's "surrounding structure." *Weaver*, 939 F.3d at 626. And courts may "consider[] extrinsic evidence of the facts and circumstances surrounding the contract's execution" to determine "if an ambiguity exists." *Mission Pharm.*, 112 F.4th at 342 n.2 (quoting *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 765 (Tex. 2018)). Regardless, the court failed to interpret the contract "as

a whole." *HM Int'l, LLC. v. Twin City Fire Ins.*, 13 F.4th 356, 359 (5th Cir. 2021) (quoting *Great Am. Ins. v. Primo*, 512 S.W.3d 890, 892 (Tex. 2017)). Numerous provisions confirm that Thurman's employment agreement with Mesa protects "the Company"—i.e., Mesa (now Power).

**3.** The court also failed to "give effect to all the provisions of the contract," rendering several parts "meaningless." *Weaver*, 939 F.3d at 626. This too was error for at least four reasons.

*First*, the court admitted that under its reading, the covenants "lack any practical effect." ROA.585. This was not a problem, the court reasoned, because its interpretation "give[s] meaning to all contractual provisions," but "subsequent events destroyed the agreement's practical effect." ROA.590.

Texas courts do not read contracts that way. Instead, they try to give all provisions meaning. *See Weaver*, 939 F.3d at 626. They also "construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served." *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015). And a "contract should be construed, if possible, to work rather than fail." SCALIA & GARNER, *supra*, at 63 (citing the Texas

Supreme Court). Because the covenants "fail" on the court's reading and do not accomplish the "business activity sought to be served," that reading fails.

*Second*, the court's interpretation strips the successor provision's benefits-and-binding-effect language of meaning. Indeed, the court admitted that under its reading, this provision is "toothless." ROA.589. Rendering language "toothless" is the opposite of giving every provision meaning.

The court misunderstood this provision. On its face, it provides that the agreement will "inure to the benefit of, and be binding on, the successors and assigns of each of the parties." ROA.69, §8.10. The court agreed that Power, as Mesa's successor, "must benefit from the Restrictive Covenants." ROA.589. But on the court's reading, Power does not receive any benefit because Power's supposed benefit is tied to a different entity (Holdings). What this really means is that Power receives *no* benefit despite contractual language promising otherwise. The fact that this provision also—if given effect—protects a purchaser of Mesa's "assets," ROA.69, §8.10, further confirms that Holdings' ongoing connection cannot be required.

*Third*, the court's interpretation renders the agreement's effective-and-valid clause meaningless. That clause instructs that "Section 4 … will be

interpreted in such manner as to be effective and valid." ROA.68, §8.6. The court's reading, however, ensures that the covenants "have no practical effect." ROA.588. The court's only response was that it did not hold any provision "legally invalid." ROA.588. But that is a *non sequitur*. By using the word "and," this provision dictates that courts must also interpret each provision "to be effective," ROA.68, §8.6, which the court *did not do*.

*Fourth*, the court's interpretation also made the survivorship provision a nullity. According to that provision, "[u]pon the expiration or other termination of this Employment Agreement, the respective rights and obligations of the parties hereto, including, without limitation, with respect to [Thurman's] obligations set forth in Section 4, shall survive such expiration or other termination." ROA.68, §8.9. On the court's view, the covenants are without "practical effect," so "there is nothing left to enforce." ROA.588-89. But that would mean the agreement has expired or terminated, in which case the survivorship provision dictates that Thurman's covenants continue and can be enforced by Power.

The court's answer was to assert that the agreement did not expire just because it has "no present practical effect." ROA.588-89 & n.*. The court reasoned that the survivorship provision is like a contract to buy a friend

dinner if the University of Texas won the Big XII Conference championship by 2030, though Texas now plays in the SEC. *Id.* The analogy is inapt. A contract that *cannot* serve any function is nothing like a condition on performance that has become *unlikely* after contract formation.

* * *

The district court resolved the contract question as a matter of law, concluding that Power's (and Thurman's pre-litigation) reading of the employment agreement is not just wrong, but unreasonable. But what is unreasonable is reading an employment agreement between Mesa (employer) and Thurman (employee) to serve no purpose because Holdings (neither employer nor employee) ceased to exist. The Court should hold that Thurman's agreement protects Power—as Mesa's successor.

Even on the court's unduly narrow terms, however, ambiguity exists: When they entered the contract, did Thurman and Mesa intend the phrase "the Company Group"—defined as "Holdings and its direct and indirect subsidiaries and affiliates," ROA.63, §3.4—to refer to an ever-shifting set of entities that happen at any particular time to be affiliated with Holdings, or to Holdings and Holdings' then-affiliates, including Mesa, that existed and could be identified when Thurman and Mesa signed the contract? Because

Texas courts eschew "hyperliteral[ism]," *Dallas*, 697 S.W.3d at 158 (quoting SCALIA & GARNER, *supra*, at 50), and read contracts to avoid "unreasonable, oppressive, or absurd results," *Mid-Continent Cas.*, 614 F.3d at 114, Power's interpretation should prevail. But at a minimum, there is ambiguity.

### C. Alternatively, the District Court Erred in Granting Summary Judgment on Power's Reformation Claim.

Regardless, if the district court's reading of the contract is right, then it wrongly granted summary judgment for Thurman on Power's reformation claim. In Texas, a reformation claim has two elements: "(1) an original agreement and (2) a mutual mistake that occurred when reducing this agreement to writing." *Tech. Automation Servs. Corp. v. Liberty Surplus Ins.*, 673 F.3d 399, 408 (5th Cir. 2012) (citing *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379 (Tex. 1987)). Courts consider "all of the facts and circumstances surrounding the parties and the execution of the instrument" in assessing these elements. *Simpson v. Curtis*, 351 S.W.3d 374, 379 (Tex. App.—Tyler 2010). "Parol evidence is admissible to show that the writing, because of a mutual mistake, incorrectly reflects the true agreement." *Hardy v. Bennefield*, 368 S.W.3d 643, 650 (Tex. App.—Tyler 2012).

Here, there is at least a genuine factual dispute concerning both elements. The parties intended for the restrictive covenants to continue so long as either Mesa or its successor employed Thurman. And no evidence suggests the parties agreed to a ticking-time-bomb provision that would destroy any employer protections upon Holdings' dissolution.

**1.** At the outset, there is a factual dispute whether there was an original agreement that the covenants would continue to protect Mesa and its successors so long as they employed Thurman. As detailed above, the court's reading of Thurman's employment agreement makes no sense. Neither the court nor Thurman explain why Mesa would have agreed to allow one of *Mesa's* most senior executives to join a competitor, share *Mesa's* confidential information with that competitor, and recruit *Mesa*'s employees to that competitor—all upon *Holdings'* expiration. The court brushed aside such common sense as going to "subjective intent." ROA.586-87. That is wrong, *supra*, pp.30-31, but even on the court's own terms, evidence of "subjective intent" speaks volumes about the parties' true agreement.

Furthermore, undisputed evidence shows that Thurman shared Mesa's understanding. In September 2021, *after* Mesa was no longer affiliated with Holdings, *supra*, pp.7-8, Thurman reported a former Mesa

executive for violating restrictive covenants identical to his, Dkt.180-9, 3-4. In fact, Thurman even verified Mesa's lawsuit (like Power's here) enforcing those covenants against the competing executive. *Id.* And three months later, when Power's parent acquired Mesa, Thurman confirmed that his "employment agreement … shall remain in full force and effect." ROA.695. Thurman thus thought he was bound by the covenants—despite Mesa's lack of affiliation with Holdings. And if there were any doubt, Thurman demanded that Quanta delete an attestation in his offer that he was not subject to a non-compete covenant after confiding in Golden the problem posed by his employment agreement. ROA.1845, 1848, 1870, 1820-21.

There also is a fact question concerning whether the parties made a mutual mistake in recording their original agreement. Beyond the evidence above, Thurman testified that he knew he was subject to a non-compete covenant and, devastatingly for him, that he did not know that the covenant depended on Holdings' existence. Dkt.180-2, 141, 277. His admission is unsurprising. Until litigation, there is no evidence that *anyone* thought Thurman's duties to his employers were tied to Holdings' existence. On the contrary, Power and Mesa representatives testified that the companies

understood Thurman's employment agreement to protect Mesa and its successors whatever the status of Holdings. Dkt.180-1, 141; Dkt.180-9, 2-5.

**2.** Nevertheless, the court concluded that "Power provide[d] no evidence" on "either element." ROA.4605, 4608. That was wrong five times over. *First*, applying Texas law, the court required Power to prove its claim by "clear and convincing evidence." ROA.4609. But the question is whether the trier of fact *could* find that element by clear and convincing evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-55 (1986). The court did not correctly apply that standard. For example, it inferred that Thurman always must have understood the contract as the court did because that is what the "plain language" says. ROA.4605. Aside from the court's question begging, Power offered evidence that is *not* how Thurman understood it.

*Second*, the court excluded the Power and Mesa representatives' testimony because neither had "personal knowledge of the employment agreement's formation or drafting." ROA.4606. But direct evidence is not required to stave off summary judgment. *See, e.g.*, *Simmons v. Pac. Bells, LLC*, 787 F.App'x 837, 843 (5th Cir. 2019). And the representatives know that no rational company would agree to such a self-defeating contract and that Mesa and Power do not currently read the contract like the court—and had

not since *at least* April 2021. Dkt.180-9, 2-3. Logically, a trier of fact could thus infer that no one ever read them that way.

*Third*, the court doubted that "post-agreement conduct can prove the parties' pre-agreement intentions." ROA.4607; ROA.4608 (disregarding Thurman's "post-agreement" views). That legal error also requires reversal.

"Parol evidence is admissible" to establish reformation—full stop. *Hardy*, 368 S.W.3d at 650; *see also Simpson*, 351 S.W.3d at 379; 28 WILLISTON ON CONTRACTS §70:135 (4th ed.). Post-agreement evidence thus bears on original understanding, which is the core issue in a reformation claim. After all, "conduct" is an "objective manifestation of the parties' intent." *Williams v. Glash*, 789 S.W.2d 261, 265 (Tex. 1990); *see also Bell v. Harrell*, 653 S.W.3d 14, 16 (Tex. App.—Amarillo 2022) ("actions of the parties in performing the contract may reveal … intent"); *SK Plymouth, LLC v. Simmons*, 605 S.W.3d 706, 718 (Tex. App.—Houston 2020) ("A party's 'intent to be bound by a contract may be evidenced by … its subsequent conduct[.]'"); *accord Town of Greece v. Galloway*, 572 U.S. 565, 575-79 (2014). In fact, "[t]he best evidence of the parties' intent is the interpretation given by their actions (or inaction)." *Safeco Ins. v. Rehab. Specialists*, 1994 WL 144778, at *9 (5th Cir. Apr. 7, 1994).

*Fourth*, the court drew inferences against Power. The court, for example, discounted Thurman's verification of Mesa's suit against a former executive for doing the same thing Thurman did as "not show[ing Thurman's] belief that the restrictive covenants in his employment agreement remained in effect." ROA.4607. But because that executive's covenants were identical to Thurman's, that *is* a reasonable inference.

The court also disregarded Thurman's own opinion that his agreement remained in force and effect because, it believed, the covenants had "no effect." ROA.4608. But the question is whether the parties *intended* that result. That Thurman later believed his covenants were in effect is highly relevant to what he understood when the parties drafted and signed it. Thurman's understanding also undermines the court's additional (and unexplained) adverse inference against Power that the evidence "reflects unilateral mistake on Mesa's behalf." ROA.4608.

*Fifth*, the court overread testimony concerning technical legal terms. ROA.4605-06. Thurman and Power's representative answered in the negative during discovery whether there was a "prior agreement" about the contract's terms or a "mutual mistake" in recording it. ROA.3253-54; Dkt.168-4, 105-07. Such testimony is a sideshow. Lay witness testimony

about legal elements is irrelevant. *See, e.g.*, *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). And even if it could count as evidence, such testimony would not undermine *other* evidence of the parties' understanding that the covenants would continue to protect Thurman's employer. At most, there is a fact question for trial.

## II. The District Court Was Wrong to Grant Summary Judgment on Power's Breach-of-Fiduciary-Duty Claim.

The district court also erred respecting Power's breach-of-fiduciary-duty claim. This claim has three elements under Texas law: "(1) a fiduciary relationship must exist between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 215 (5th Cir. 2018). Despite facts in the record supporting each element, the court entered judgment in favor of Thurman. This was error.

### A. There Is a Genuine Dispute of Fact Whether Thurman Solicited Golden.

To begin, the court *sua sponte* granted summary judgment for Thurman on breach. ROA.4618. Yet there is (at least) a factual dispute about whether Thurman solicited Golden to resign and join Quanta. Given that he went so

far as to draft Golden's offer letter and to put the best spin on Quanta's compensation, Power at a minimum is entitled to a jury.

**1.** As Power's Vice President, Thurman owed his employer the fiduciary duty of loyalty. *See, e.g.*, *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508-10 (Tex. App.—Houston 2003).[3] And where an employee has a "fiduciary relationship," he must "act primarily for the benefit of the employer," *id.*, so the "solicitation of employees" by a fiduciary is "specifically proscribed" by fiduciary-duty law, *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 285 (5th Cir. 2007).

Given the importance of business loyalty, Texas courts apply a capacious understanding of solicitation. The "commonly understood meaning" is "'to make petition to: ENTREAT, IMPORTUNE, CONCERN'; 'to approach with a request or a plea (as in selling or begging)'; 'to move to action: serve as an urge or incentive: INCITE'; 'to strongly urge (as one's cause or point): insist upon'; 'to endeavor to obtain by asking or pleading';

[3] Power moved for summary judgment on whether a fiduciary relationship existed. ROA.1720. Thurman did not, instead arguing that the existence of a fiduciary relationship is a "fact-intensive inquiry" that "cannot be resolved at the summary judgment stage." ROA.3482. The court concluded that there was a factual dispute for the jury to resolve. ROA.4610.

and 'to seek eagerly or actively.'" *In re Athans*, 478 S.W.3d 128, 135 (Tex. App.—Houston 2015, no pet.) (citation omitted). Solicitation "implies a serious request," but "requires no particular degree of importunity, entreaty, imploration, or supplication." *Id.* at 135 n.5.

Actions "enabling the move of other employees" to a competitor thus constitute solicitation, *AmeriPath, Inc. v. Hebert*, 447 S.W.3d 319, 341 (Tex. App.—Dallas 2014), as does the "recruitment of [the company's] employees," *Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 170 (5th Cir. 2010). Solicitation also captures "advising" a competitor "about the employment terms to offer a [company] employee," *Coe v. DNOW LP*, 718 S.W.3d 338, 372-73 (Tex. App.—Houston 2025), "introducing … employees to competitors' representatives and flying an employee to interview with a competitor," *Navigant*, 508 F.3d at 287-88, and "forward[ing] information … about a potential [employee] who had submitted her application and resume," *Neurodiagnostic Consultants, LLC v. Nallia*, 2019 WL 4231232, at *5, 9 (Tex. App.—Austin Sept. 6, 2019).

Furthermore, "whether an employee's acts constitute a breach of fiduciary duty or permissible preparation to compete is a factual issue." *Ray Mart Inc. v. Stock Bldg. Supply of Tex. LP*, 302 F.App'x 232, 240 (5th Cir. 2008).

"[S]olicitation" thus generally is "a fact issue to be determined by the jury." *Abetter*, 113 S.W.3d at 513.

Here, at least eight facts individually—and certainly together—confirm there is a genuine fact question. Specifically, while serving as Power's Vice President, Thurman:

1. Spoke with Cassidy, a Quanta regional president, about Golden potentially joining him at Quanta. ROA.1874, 3525.
2. Encouraged Golden to work for Quanta. ROA.3525.
3. Drafted Golden's offer on NHPL letterhead and emailed it to Cassidy (using his Power account) to "push" things "forward." ROA.3525; Dkt.121-28.
4. Repeatedly texted Cassidy to move things along, ROA.1748, 1879, prompting Cassidy to reassure Golden that Quanta would "make it work," ROA.1884.
5. Shared confidential information about Golden's compensation. ROA.1748, 3526.
6. Encouraged Golden to consider bonus opportunities despite Quanta offering "less of a salary," and reassured Cassidy that Golden would be "on board" with the offer. ROA.1748, 3527.

7. Provided Cassidy with Golden's personal email address so that Quanta could email the offer. ROA.1887.

8. Resigned with Golden on the same day. Dkt.180-4; Dkt.121-35, 83.

Especially viewed in Power's favor (as the law requires), jurors could conclude that Thurman solicited Golden. He did more than ask questions—he *sold* Golden on Quanta and hounded Cassidy to make an offer. *Compare Athans*, 478 S.W.3d at 135 ("more than merely to ask"). He pushed the stalled process forward. *Compare Hernandez v. Combined Ins. Co. of Am.*, 2021 WL 520456, at *13, 16 (Tex. App.—Fort Worth Feb. 11, 2021) ("move[d] to action"). He even drafted the offer and—after promoting bonus opportunities—reassured Cassidy that Golden would be "on board." *Compare Coe*, 718 S.W.3d at 372-73 ("advising" competitor on "employment terms"). And he forwarded Golden's confidential material and personal email address. *Compare Neurodiagnostic Consultants*, 2019 WL 4231232, at *5 ("forward[ing]" employee's "information").

All this adds up to something that *at least* should go to a jury. Even Thurman argued below that "this is precisely the type of factual dispute that courts consistently reserve for jury determination." ROA.3495.

**2.** In *sua sponte* granting summary judgment for Thurman on this element, the court made numerous errors—each of which requires reversal.

*First*, summary judgment was entered *sua sponte*. Yet "[i]n our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020); *accord Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (summary reversal). Alarms should sound when a court is more aggressive than even an experienced defense team. Yet when Power filed a Rule 59(e) motion pointing out genuine issues of disputed fact on this point, the court denied it summarily.

*Second*, the court ruled that Thurman's conduct was not solicitation as a matter of "Texas law." ROA.4618. But Texas law says the opposite—solicitation is a "fact issue to be determined by the jury." *Abetter*, 113 S.W.3d at 513. The court's own cited cases prove the point. Most reviewed a *jury* verdict. *See Athans*, 478 S.W.3d at 135; *Navigant*, 508 F.3d at 287-88; *Abetter Trucking*, 113 S.W.3d at 513; *Eurecat US, Inc. v. Marklund*, 527 S.W.3d 367, 383 (Tex. App.—Houston 2017, no pet.); *Wooters v. Unitech Int'l, Inc.*, 513 S.W.3d 754, 764 (Tex. App.—Houston 2017). And one *denied* summary judgment because (as here) "a reasonable juror [could] conclude" the conduct was "a breach." *Providence Title Co. v. Truly Title, Inc.*, 2024 WL 3927229, at *11 (E.D.

Tex. Aug. 22, 2024). By contrast, the court here prevented a jury verdict by granting summary judgment.

*Third*, the court misapplied Rule 56. At summary judgment, courts must "view all facts and draw all reasonable inferences in favor of the nonmoving party." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 274 n.1 (2009). But here, the court all but disregarded Power's evidence in favor of Thurman's self-serving account. *E.g.*, ROA.4615-16 (giving single-sentence summary of facts raised by Power while detailing Thurman's assertions for over a page). And the court outright drew inferences adverse to Power. *E.g.*, ROA.4616-17 (asserting that Thurman did not "lur[e]" Golden and "negotiated [no]thing on Golden's behalf").

Both the Supreme Court and this Court have reversed less egregious misapplications of Rule 56. Courts cannot resolve "disputed issues in favor of the moving party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). Courts thus "do not *decide* factual disputes at the summary-judgment stage; [they] focus on whether there *are* material factual disputes that should be decided by a factfinder." *Cory*, 103 F.4th at 1077; *see id.* at 1078-79 (collecting reversals). Nothing about this rule turns on whether a court prefers one side's evidence. *See, e.g.*, *In re Deepwater Horizon*, 48 F.4th 378, 386 (5th Cir. 2022).

*Fourth*, the court concluded there was no solicitation because "Golden decided on his own to leave Power for NHPL months before Thurman's involvement." ROA.4615. But that is a question of proximate cause. Breach concerns whether Thurman, for example, did more than ask questions, *Athans*, 478 S.W.3d at 135, "serve[d] as an urge or incentive," *id.*, "approach[ed] with a request or a plea," *id.*, gave a "serious request," *id.* at 135 n.5, "advis[ed]" a competitor on employment terms, *Coe*, 718 S.W.3d at 372-73, or "recruit[ed]" an employee, *Meaux*, 607 F.3d at 170. Thurman did all of that and more. Whether his disloyalty was successful goes to proximate cause. *See, e.g.*, *Navigant*, 508 F.3d at 284-91; *Helping Hands Home Care, Inc. v. Home Health of Tarrant Cnty., Inc.*, 393 S.W.3d 492, 507 (Tex. App.—Dallas 2013).

Regardless, Power offered evidence refuting the court's theory—including that Golden was wavering until the day he quit. Dkt.180-3, 338; Dkt.180-4. Thurman is free to advance a different theory to the jury, but even he did not argue below that he was entitled to summary judgment on this point.

### B. There Is a Genuine Dispute of Fact About Whether Thurman's Solicitation Was a Proximate Cause of Power's Injuries.

The district court also granted summary judgment because Power "cannot establish proximate cause" "as a matter of law." ROA.4620. Not so. The court again misapplied Texas law and Rule 56.

**1.** Proximate cause has two elements: "cause in fact and foreseeability." *Ryder Integrated Logistics, Inc. v. Fayette County*, 453 S.W.3d 922, 929 (Tex. 2015). Because foreseeability is undisputed, the only question is factual causation. Yet conduct is a cause in fact if "it serves as 'a substantial factor in causing the injury and without which the injury would not have occurred.'" *Id.* A substantial factor "has such an effect in producing the harm as to lead reasonable men to regard it as *a* cause." *Rogers v. Zanetti*, 518 S.W.3d 394, 402 (Tex. 2017) (emphasis added). The word "a" is significant; jurors do not decide whether conduct was *the* proximate cause but "whether an act … was '*a*' proximate cause." *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001). "More than one act may be the proximate cause of the same injury." *Id.*; *accord Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010).

As with solicitation, under Texas law, "proximate cause is ultimately a question for a fact-finder." *Ryder*, 453 S.W.3d at 929; *see also Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 518 (Tex. 2019); *Meaux*, 607 F.3d at 170 ("arguments" about proximate cause "are matters for the trier of fact"). Nor is there need for "direct and positive proof, as the jury may infer proximate cause from the circumstances surrounding the event." *Navigant*, 508 F.3d at 289. Thus "[c]ircumstantial evidence and inferences therefrom are a sufficient basis for a finding of causation." *Id.*

**2.** Here, given the close succession between Thurman's breach and Golden's resignation, a jury could infer that Thurman was "a" cause. True, Golden had previously expressed interest in working for Quanta, and Thurman offered a self-serving affidavit from NHPL. But a juror could conclude that no offer would have come had Thurman not bombarded Cassidy and shared Power's confidential information. A juror also could conclude that Golden would not have resigned without Thurman's encouragement, which too was at least *a* cause. That is enough. *See, e.g.*, *Caliber Home Loans, Inc. v. Cove*, 2025 WL 71983, at *7 (N.D. Tex. Jan. 10, 2025) ("A reasonable jury could conclude that Cardinal's actions proximately

caused individuals to *actually leave* Caliber … even if they were already in the process of considering other employment.”).

**3.** The court, however, concluded that Thurman’s solicitation was not “the cause in fact of Power’s alleged injuries.” ROA.4618. It reasoned that “[t]he record shows that Golden made up his mind to join one of Quanta’s companies independently” and “Cassidy made the decision to hire Golden” before Thurman’s involvement. ROA.4616, 4618.

Both steps rest on hotly disputed facts. Although Golden (conveniently) testified he decided to leave Power before Thurman’s disloyalty, he also testified he would not “resign[]” from Power unless he was “100 percent sure” his new job “was good,” which he was not until the day he resigned with Thurman—*after* Thurman’s meddling. Dkt.180-3, 338. Given the chronology, a jury could conclude that Thurman’s disloyalty was “a” cause for Golden reaching that certainty. “By failing to credit evidence that contradicted … its key factual conclusion[],” the court “improperly ‘weigh[ed] the evidence’ and resolved disputed issues in favor of the moving party.” *Tolan*, 572 U.S. at 657; *see also Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 159, 162 (5th Cir. 2021). Indeed, “where,” as here, “both parties have submitted evidence of contradictory facts,” courts must “resolve

controversies in favor of the nonmoving party." *Man Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 481 (5th Cir. 2006).

It is also disputed that Quanta's decision to offer Golden a job was final before Thurman's solicitation. Cassidy (conveniently) says he made his mind up in November 2023. But at that point there was no offer. And the process was stalled—hence Thurman's persistence. The evidence "'reasonably lead[s]' to the 'not implausible' conclusion" that Thurman revived this stalled process. *Cory*, 103 F.4th at 1079. To reach its contrary conclusion, the court relied on witnesses with a vested interest, which "a reasonable jury could simply disbelieve." *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 345 (5th Cir. 2022). Instead, the court should have "disregard[ed] all evidence favorable to the moving party that the jury is not required to believe," including (perhaps especially) such biased testimony. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

The court also botched Texas law in at least three ways. *First*, it never acknowledged that "proximate cause is usually a question of fact to be resolved by a jury," not the court. *Homeland Express, LLC v. Seale*, 420 S.W.3d 145, 149 (Tex. App.—El Paso 2012, no pet.). *Second*, it believed there can only

be one cause. ROA.4618 (claiming Thurman was not "*the* cause in fact of Power's alleged injuries" (emphasis added)).

*Third*, the court cited a decision supposedly "finding no causation for breach of fiduciary duty because [a] third party had made up its own mind before [the] alleged conduct." ROA.4619 (citing *Centurion Logistics LLC v. Brenner*, 2024 WL 5244618 (Tex. App.—Dallas Dec. 30, 2024, pet. denied)). That case had nothing to do with solicitation. Rather, a company sued its attorneys for causing a settlement to fall through, and undisputed evidence refuted causation. *Centurion*, 2024 WL 5244618, at *12. Here, by contrast, each step in the court's analysis rests on disputed facts.

### C. The District Court Wrongly Required Independent Damages for Thurman's Disclosure of Confidential Information.

The district court also granted summary judgment for Thurman because Power "cannot establish actual damages" stemming from Thurman's disclosure of Power's confidential information. ROA.4621. Not only is that conclusion tethered to the court's erroneous solicitation analysis, but Power is entitled to disgorgement regardless.

**1.** Power brought a single fiduciary duty claim based on one course of conduct. ROA.665. Part of that course of conduct includes Thurman's

disclosure of confidential information, including Golden's employment terms. Because Thurman's disloyalty constitutes a single, unified breach of his fiduciary duty, Power is not required to prove damages for each specific act comprising that breach. *See, e.g.*, *Sw. Bell Tel. Co. v. Wilson*, 768 S.W.2d 755, 761 (Tex. App.—Corpus Christi-Edinburg 1988) (refusing to require plaintiff to connect all "specific tortious conduct to specific injuries suffered and damages awarded"); *Saden v. Smith*, 415 S.W.3d 450, 467-69 (Tex. App.—Houston 2013) (permitting "unified recovery for one broadly described injury").

The court nevertheless held that Power "cannot rely on [its] damages" from solicitation because, it reasoned, there was no breach or causation concerning solicitation. ROA.4621. Because that was wrong, Power can "rely on those damages." ROA.4621. Regardless, the court erred by slicing Power's lone fiduciary-duty claim effectively into multiple claims.

**2.** Even putting that aside, Power is entitled to disgorgement based on Thurman's brazen disclosure of confidential information. Damages are not required where, as here, "a defendant breached a fiduciary duty and obtained a 'secret gain or benefit.'" *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017). Thurman shared highly

confidential documents with Quanta to secure a lucrative offer from Quanta. Dkt.121-13&15; ROA.3518-21; Dkt.121-2, 196-97; Dkt.121-6, 160-61; ROA.1847-48. Thurman's breach of his confidentiality duty, therefore, resulted in his ill-gotten benefit. Power is entitled to that benefit.

The court, however, concluded that Power may not "assert a claim for the equitable remedy of disgorgement." ROA.4621. *First*, it claimed that such relief was off-limits because Power did not "pray[] for disgorgement." ROA.4622. But Rule 54(c) "authorizes district courts to grant any appropriate relief following a general prayer by the plaintiff, even if the plaintiff did not specifically seek it," if the "relief is otherwise legally permitted." *Peterson v. Bell Helicopter Textron, Inc.*, 806 F.3d 335, 340 (5th Cir. 2015); *accord Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (summary reversal). Power's complaint not only included a general prayer for relief, ROA.665-66, but also a specific allegation that Thurman's breach "resulted in a benefit to Thurman," ROA.665, which Power amply established with evidence in its summary-judgment briefing, ROA.3810-12. Even if Texas state law requires a stricter pleading standard, *see* ROA.4622-23 (relying on state cases), Rule 54 "displaces state law," *Berk v. Choy*, 146 S.Ct. 546, 552 (2026). That alone justifies reversal.

*Second*, the court gestured in a footnote that "Thurman's compensation" was not "causally tied to" his undisputed disclosure of confidential information. ROA.4623 n.2. Because Power offered evidence that Thurman disclosed Power's confidential information to Quanta to help secure his position, a factfinder could find a causal tie between his breach and his ill-gotten gains. At a minimum, that defeats summary judgment.

## III. The District Court Erroneously Granted Thurman Advancement and Indemnification.

Thurman's attempt to obtain advancement and indemnification effectively concedes that he owes fiduciary duties to Power; otherwise, he could not rely on Power's operating agreement, which only provides benefits to Power's leadership. Overlooking that incongruity (and the fact that Quanta is paying Thurman's legal fees anyway), the district court awarded Thurman millions of dollars.[4] Not only does the court's analysis contravene plain contractual language—to say nothing of that court's own

[4] Breach-of-fiduciary duty is the only claim implicating advancement and indemnification because Thurman did not cross-appeal the orders dismissing his counterclaims concerning reformation. Nor did he seek indemnification concerning Power's breach-of-contract claims.

approach to interpretation—but it does so to reward a bad actor for deliberately harming Power. The Court should reverse.

### A. Thurman Has No Right to Advancement or Indemnification.

The court ordered advancement and indemnification under Power's operating agreement. ROA.4021, 4629. That agreement is "governed by, and construed under," North Carolina law. Dkt.100-2, §5.1. North Carolina courts "examine the language of the contract" to determine "the parties' intent." *State v. Philip Morris USA Inc.*, 685 S.E.2d 85, 90 (N.C. 2009). They also review "the entire instrument," *id.*, and prefer "an interpretation which gives a reasonable meaning to all provisions of a contract" over "one which leaves a portion of the writing useless or superfluous," *S. Seeding Serv., Inc. v. W.C. Eng., Inc.*, 719 S.E.2d 211, 215 (N.C. App. 2011).

Thurman has no right to indemnification under North Carolina law. Because this Court must reverse regarding Power's fiduciary-duty claim, it must also reverse Thurman's indemnification award. Under North Carolina law, the "right to indemnification" generally does not "kick in" "during the litigation," but only after a case's resolution. *Vanguard Pai Lung, LLC v. Moody*, 2020 WL 4477043, at *2 (N.C. Super. Aug. 4, 2020). Since the district court erred on the merits, the Court must also reverse any indemnification

award connected to the merits. Regardless, Thurman is not entitled to indemnification or advancement for three independent reasons.

*First*, advancement and indemnification are barred because this "proceeding[]" "involve[es] the enforcement of" an employment agreement with Power. Under the operating agreement, advancement (§2.7(f)) and indemnification (§2.7(b)) are "[s]ubject to" the "[l]imitation[s]" in "Section 2.7(k)." Dkt.100-2, §§2.7(b), (f), (k). Under §2.7(k), Power has no obligation "to indemnify, or advance expenses to, any person in connection with … (ii) proceedings or claims involving the enforcement of any employment … agreement with or of" Power "to which such person may be a party." Dkt.100-2, §2.7(k)(ii). That provision governs here.

A "proceeding" is a "legal action." *Proceeding*, WEBSTER'S NEW INT'L DICTIONARY 1434 (2d ed. 1934); *see also* MODEL BUS. CORP. ACT §8.50 (A.B.A. 2025) ("'[P]roceeding' means any threatened, pending, or completed action, suit or proceeding[.]"). And an "action" refers to a "civil or criminal judicial proceeding; esp., lawsuit." *Action*, BLACK'S LAW DICTIONARY (12th ed. 2024). The words "proceeding" and "suit" thus have been interchangeable for almost two centuries of American law. *E.g.*, *Schwartz v. Jefferson*, 520 S.W.2d 881, 886 (Tex. 1975) (defining "suit" as "any proceeding in a court … by

which an individual pursues [a] remedy" (quoting, ultimately, *Weston v. City Council of Charleston*, 27 U.S. 449, 464 (1829) (Marshall, C.J.))). To "involve" means "to have within or as part of itself: include." *Involve*, MERRIAM-WEBSTER, https://tinyurl.com/3s6hx8pd.

Thurman is not entitled to advancement or indemnification because this proceeding seeks to enforce Thurman's employment agreement. Power's breach-of-contract claims seek to enforce the employment agreement, as does Power's claim for reformation. *See Brinker v. Wobaco Tr. Ltd.*, 610 S.W.2d 160, 166 (Tex. App.—Texarkana 1980, writ ref'd) ("Reformation does not change the agreement; it enforces the agreement."). Because this lawsuit is "a proceeding" involving enforcement of Thuman's contract, the §2.7(k)(ii)-bar applies.

*Second*, advancement and indemnification are also barred because "part" of this "proceeding" was "initiated" by Thurman without authorization. Advancement and indemnification are barred "in connection with (i) a proceeding (or part thereof) initiated by such person unless" it "was authorized by the Board of Managers." 100-2, §2.7(k)(i). As explained, "proceeding" refers to the entire case, and a "part" is "something less than a whole." *Gonzalez v. Mid-Continent Casualty Co.*, 969 F.3d 554, 561 (5th Cir.

2020) (citing WEBSTER'S NEW INT'L DICTIONARY 1781 (2d ed. 1934)). To "initiate" means "to cause or facilitate the beginning of: set going." *Initiate*, MERRIAM-WEBSTER, https://tinyurl.com/2vptwcu5. These terms preclude advancement and indemnification because Thurman's counterclaims are part of the case he initiated without authorization.

*Third*, in any event, Thurman is not entitled to advancement or indemnification because of his bad faith. Under §2.7(b), indemnification is warranted only "if [Thurman] acted in good faith and in a manner [he] reasonably believed to be in or not opposed to the best interests of" Power, Dkt.100-2, §2.7(b), and advancement is only allowed when "indemnification may be provided under … Section 2.7(b)," §2.7(f).

Here, Thurman did not act in Power's best interests. Instead, he betrayed Power. As Power's Vice President, he decamped to Power's competitor, engaged in extensive solicitation to take a key employee to Power's competitor, and shared highly confidential information with Power's competitor. This disloyalty breached his contractual and fiduciary duties, but in all events, no one can say that such disloyalty was "in or not opposed to [*Power's*] best interests." Dkt.100-2, §2.7(b). If nothing else, there is at least a factual dispute about Thurman's "good faith." *Id.*

**B. The District Court Misapplied the Operating Agreement.**

Once more, the district court's responses uniformly fail.

**1.** With respect to §2.7(k)(ii), the court did not deny that the ordinary meaning of "proceeding" is an entire case. Instead, it reasoned that "[b]ecause the clause includes both 'claims' and 'proceedings,' precluding advancement [and indemnification] for an entire proceeding when only a single claim merits preclusion under section 2.7(k)(ii) would render 'claims' superfluous." ROA.4030. And because the court concluded that Power's fiduciary-duty claim did not enforce the employment agreement, advancement and indemnification were not barred. ROA.4030.

The court's interpretation of "proceedings" is triply wrong. *First*, to avoid rendering "claim" superfluous, it effectively excised the word "proceedings." But that canon could only apply here if "proceeding" were given some *other* permissible meaning that avoided redundancy—which the court did not and could not do. As the Supreme Court has explained, "the canon against superfluity assists only where a competing interpretation gives effect to every clause and word." *Microsoft Corp. v. i4i Ltd.*, 564 U.S. 91, 106 (2011); *see also Domain Prot., LLC v. Sea Wasp, LLC*, 23 F.4th 529, 538 (5th Cir. 2022) (similar). If there is no way to avoid superfluity, courts must give

both words their natural meaning and let the consequences follow. The answer is not to delete the broader word.

*Second*, the word "proceeding" appears throughout §2.7, and it is exclusively used as a synonym of "action" or "suit"—not "claim." Dkt.100-2, §2.7(a) ("Actions, Suits or Proceedings"); §2.7(b) (same); §2.7(c) (same); §2.7(f) (same); [redacted]. That's why "proceeding" in §2.7(k)(i) must refer to the entire "legal action." ROA.4027. Courts should give the same word the same meaning throughout "the same document." *Tex. Pac. Land Corp. v. Horizon Kinetics LLC*, 306 A.3d 530, 564 (Del. Ch. 2023).

*Third*, the agreement uses overlapping terms throughout §2.7 (e.g., "action, suit or proceeding"). Such a belt-and-suspenders approach broadly limits advancement and indemnification. That makes sense. The most obvious category of claims that could be asserted against an executive in the same "proceeding" as a breach-of-employment-agreement claim is (as here) a breach-of-fiduciary-duty claim. Neither the district court nor Thurman has explained why a company would agree to indemnify an executive for litigation brought by the company itself alleging that the executive breached fiduciary duties owed to the company, let alone why the company would bar indemnification for disputes with that same executive about

employment terms while carving out fiduciary-duty disputes. Reading the agreement to mean what it says avoids this problem.

In a footnote, the court also said it is irrelevant that the dismissed breach-of-contract claims seek to enforce Thurman's employment agreement because §2.7(k)(ii) "uses the present tense" ("involving") and "Power's suit no longer includes this claim." ROA.4030 n.8. Because the Court should reverse the dismissal of those claims, that is irrelevant. It is also wrong. For one thing, this appeal is part of the case, and it includes the breach-of-contract claims. For another, the court's interpretation makes the "[l]imit" on advancement and indemnification a dead letter. Dkt.100-2, §2.7(k). If Power's claim is dismissed, it does not bar advancement or indemnification, but if Power's claim succeeds, advancement and indemnification are barred by a *different* provision. Dkt.100-2, §2.7(b) (indemnity barred if Thurman is "adjudged … liable to" Power).

**2.** With respect to §2.7(k)(i), the court interpreted "part" of a proceeding to mean "an independent proceeding overlapping the first *that could exist on its own*, like offensive third-party claims or permissive counterclaims." ROA.4027. Because Thurman's counterclaims are

compulsory, the court reasoned that although they are *in* this proceeding, they are not "*part*" of it. ROA.4027 (emphasis added).

Courts, however, "must give ordinary words their ordinary meanings." *T.M.C.S., Inc. v. Marco Contractors, Inc.*, 780 S.E.2d 588, 597 (N.C. App. 2015). The court did not do so. A "part" is simply "something less than a whole." *Gonzalez*, 969 F.3d at 561. Counterclaims of any kind are part of a case that are initiated by the defendant. The operating agreement's plain text therefore forbids advancement and indemnification.

Rather than engaging with the text, the court asserted that the provision's plain meaning makes advancement and indemnity "useless" because it gives Power veto power. ROA.4029. The court's concern about rendering provisions "useless" is curious given that its interpretation of Thurman's employment agreement rendered a host of provisions useless—including that agreement's central provisions. *See supra* I.B.3. But it is also misplaced: requiring authorization does not eliminate advancement and indemnification. Nor is it surprising that companies do not lightly agree to provide advancement and indemnification to executives they are suing for breaching employment agreements and fiduciary duties, much less should courts expect companies readily to pay for counterclaims asserted against

the companies themselves. Otherwise, disloyal executives looking for settlement leverage could inflict massive pain on their employers simply by filing counterclaims, including compulsory ones. The court's policy views ignore what the agreement says and are backwards to boot.

In addition, the court claimed that even if Power's interpretation were "correct," it would still "construe [§2.7(k)(i)] against Power" because this provision would be ambiguous. ROA.4027 n.4. But §2.7(k)(i) unambiguously bars advancement and indemnification. Regardless, if the "agreement is ambiguous," then "interpretation" is a fact question "for the jury." *Int'l Paper Co. v. Corporex Constructors, Inc.*, 385 S.E.2d 553, 556 (N.C. App. 1989).

**3.** Finally, the court offered distinct reasons why advancement and indemnification are not barred by the operating agreement's "good faith" and "best interests" provisions.

Regarding advancement,[5] the court reasoned that §2.7(f) conditions advancement on whether Thurman "may be provided" indemnity (that is, whether he "*could be* eligible for indemnification but not that he *is* eligible").

---

[5] Advancement is only relevant if the Court remands for additional proceedings. Otherwise, advancement has been paid.

ROA.4022. The court also thought that because the "good faith" condition on indemnity requires "considering the merits" and is introduced by "if," "Thurman's good faith remains a future inquiry and does not affect whether [he] 'may be provided' indemnity" before resolution of Power's claims. ROA.4025. In other words, the court claimed that assessing good faith is only proper after resolving Power's claims. And because it is possible that the court *could* find good faith when it considers the merits, indemnification *might* be warranted and thus advancement *is* required.

That is mistaken and makes the phrase "may be provided [indemnity] under … Section 2.7(b)" superfluous. If the primary condition on indemnification is irrelevant for determining advancement, tethering advancement to indemnification does nothing. And while "if" introduces a condition, it says nothing about *when* the court determines whether the condition is satisfied. Summary judgment is an ordinary time to test whether factual disputes exist. Rather than doing that testing, however, the court effectively made advancement automatic.

Concerning indemnification, the court concluded that Thurman's good faith is irrelevant if he mounts a successful defense. ROA.4627. But that interpretation nullifies the good-faith condition because the agreement

*elsewhere* precludes indemnity if Thurman is not successful. Dkt.100-2, §2.7(b). Regardless, it is not enough that Thurman acted in good faith; he must also have "reasonably believed [himself] to be in or not opposed to the best interests of" Power. *Id.* But he covertly breached his non-compete agreement by defecting to (and with the help of) Power's biggest competitor, poached a key employee for that competitor, and indisputably shared Power's confidential information with that competitor. Whatever else may be said about Thurman, he did not act in Power's best interests.

## CONCLUSION

The Court should reverse or vacate the amended final judgment.

March 30, 2026

Respectfully submitted,

s/ *Aaron L. Nielson*
Aaron L. Nielson
David Hutchison
KIRKLAND & ELLIS LLP
401 W. 4th Street
Austin, TX 78701
Telephone: (512) 678-9100

Anna G. Rotman, P.C.
Allyson C. Arias
KIRKLAND & ELLIS LLP
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3600

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the above appellate brief was filed electronically on March 30, 2026, and will therefore be served electronically upon all counsel.

*s/ Aaron L. Nielson*
Aaron L. Nielson

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief complies with Fed. R. App. P. 32(a)(7)(B) and (C) because it contains 12,990 words. The brief also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & 32(a)(6) because it has been prepared in a proportionally spaced, Roman style typeface of 14 points or more.

*s/ Aaron L. Nielson*
Aaron L. Nielson